IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISA LYNCH<br>400 Brister Road<br>Bensalem, PA 19020<br><br>       Plaintiff,<br>v.<br><br>GLOBAL EQUIPMENT COMPANY,<br>INC., d/b/a GLOBAL INDUSTRIAL<br>11 Harbor Park Drive<br>Port Washington, NY 11050<br><br>       Defendant. | CIVIL ACTION<br><br>No.: 3:24-cv-7735-RK-JBD<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED CIVIL ACTION COMPLAINT

Plaintiff, Lisa Lynch (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

### I. Introduction

1. Plaintiff has initiated this action to redress violations by Global Equipment Company, Inc., d/b/a Global Industrial (hereinafter referred to as "Defendant") of the New Jersey Law Against Discrimination ("NJ LAD" - N.J.S.A. §§ 10:5-1 et. seq.) and the Americans with Disabilities Act, as amended ("ADA"- 42 U.S.C. 12101, et. seq). Plaintiff asserts herein inter alia that she was unlawfully terminated from her employment for discriminatory and retaliatory reasons.

### II. Parties

2. The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

3. Plaintiff is an adult who resides at the above-captioned address. Plaintiff is a resident, domiciliary and citizen of Pennsylvania.

1

4.  Defendant is incorporated and headquartered in New York at the above-captioned address. Defendant, a resident, domiciliary, and citizen of New York, sells and distributes a wide range of industrial and maintenance, repair, and operations products to customers across North America.

5.  At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

### III. Factual Background

6.  The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

7.  Plaintiff was hired by Defendant effective on or about October 24, 2016; and in total, Plaintiff was employed by Defendant for approximately 7.5 years (until termination effective in May of 2024).

8.  Plaintiff was deemed to work for Defendant from its office(s) at 24 Applegate Drive, Robbinsville, NJ 08691 (in Mercer County New Jersey). Plaintiff was at all relevant times deemed reporting from and based within Defendant's aforesaid Robbinsville, NJ location.

9.  From the time of Plaintiff's hire in 2016 until the beginning of the COVID-19 pandemic in or about March of 2020, Plaintiff worked in-office at the Robbinsville, NJ office location every day.

10. Plaintiff, like many other employees, then began to work exclusively from home throughout the course of the pandemic (from approximately March of 2020 until early 2023). This period overlapped with the onset of Plaintiff's medical conditions and treatment, discussed *infra*.

11. Plaintiff worked for Defendant in the role(s) of sales, and as of termination was referred to by Defendant as working in sales, as a sales manager, or as a strategic account manager (as there was some variation in reference to Plaintiff's role(s) over time during her tenure).

12. During Plaintiff's last approximately 3 months of employment (pre-termination), she was directly supervised by Keith Fitzgerald ("Fitzgerald"). Fitzgerald began working for Defendant in or about February of 2024, is based in Ohio, and has been employed by Defendant as a Director of Strategic Accounts. Fitzgerald has been (and was) supervised by Evelyn Davis ("Davis"), based in Georgia, a Vice President of Sales for Defendant.[1]

13. Since in or about 2020, Plaintiff had been diagnosed with cancer (and related medical complications). Some of Plaintiff's medical complications from 2020 to the present include (but are not limited to):

- An inoperable tumor.
- Lack of a salivary gland (due to radiation treatment).
- Neuropathy in all four (4) of her limbs.
- Bowel and urinary complications (primarily resulting from medication side effects).
- Immune system limitations and impacts.
- Hearing loss.
- Thyroid problems.

14. Plaintiff's health condition(s) examples mentioned *supra* are not intended to be all-inclusive, but rather, examples. Due to a lack of a salivary gland, Plaintiff's ability to talk at times, chew, swallow, and communicate can be impacted (as her throat and mouth get extremely dry and

---

[1] During a period of time during Plaintiff's employment, she had also previously been directly supervised by Davis.

she accumulates extensive mucus). Due to neuropathy, Plaintiff at times has difficulty performing certain manual tasks, gets sudden muscle weaknesses, and she gets extreme numbness or discomfort in her limbs. Due to her inoperable tumor, Plaintiff gets facial pain, nosebleeds, headaches, and other symptoms. Again, this is intended to be nothing more than a generalized outline of Plaintiff's unfortunate (permanent) health situation.

15. From 2020 through the present, Plaintiff has treated through radiation, extensive medication, days off from work as medically necessary, diagnostics, continued medical appointments, and therapy. And in particular, Plaintiff had established a home work environment that enabled her to perform all essential functions of her job(s) and to work in an exemplary manner while in the employ of Defendant.

16. Prior to Fitzgerald's hire, Plaintiff had for years: (a) received praise; (b) received good evaluations; and (c) obtained very good metrics related to objective performance for sales goals. She was a very good employee overall, and Plaintiff could not possibly be criticized from any objective performance standards (inclusive of sales).

17. As a Strategic Account Manager (a/k/a "SAM"), Plaintiff had at any given time at or around seven (7) employees who reported to her. Four (4) of them worked remotely, and three (3) of them worked either from a New York office or Plaintiff's assigned New Jersey office. To be clear, Plaintiff was able to perform 100% of her role remotely without issue (as she often worked remotely). And there were certainly no problems with her being managed remotely by her immediate NY manager (a Director) or her GA indirect manager (a Vice President). Indeed, as mentioned above, more than 50% of Plaintiff's own team consistently worked remotely.

18. For at least two (2) years, Plaintiff worked 100% remotely (from 2021 – 2023) during the COVID pandemic and thereafter. Plaintiff performed her role exceptionally for years on a 100% remote basis.

19. In early 2023, Plaintiff's management expressed a (generalized) preference that Plaintiff have some presence in the physical office(s) at times. From early 2023 through late 2023, Plaintiff went into work in-person twice a week (on Tuesdays and Thursdays) to establish a regular presence as requested, against her doctor's orders.

20. During this time, Plaintiff oversaw three (3) employees in the New Jersey office out of which she was based, **none of whom** worked in the office. She additionally supervised four (4) New York employees and was required to work at the New York office approximately once a month.

21. Other than New Jersey and occasionally New York, Plaintiff did not work in any other in-office location for Defendant.

22. By in or about the January of 2024 timeframe, Defendant's management was expressing a preference that Plaintiff start coming to the office(s) four (4) days per week and to work remotely one (1) day per week. There was no work-related justification relayed other than, as stated above, a companywide preference of more work from office locations for many of Defendant's team members.

23. Pre-pandemic, Plaintiff didn't mind and had no qualm whatsoever with working 40-hour, 50-hour, or 60-hour workweeks in-person from Defendant's physical premises (in New Jersey). However, as explained *supra*, by 2021 Plaintiff had undergone more than 30 weeks of chemo therapy and would for years to come (and into the indefinite future) endure serious health problems and side effects of her conditions and medical treatment / medications.

24. Between January 2024 – May 2024, Plaintiff was seeking medical accommodations to work five (5) days per week remotely. Plaintiff offered as part of the accommodation request to still perform any necessary travel, to attend any trade shows, and to come to the office for any necessary meetings.

25. In addition to her own management, Plaintiff was discussing medical accommodations in the January 2024 – May 2024 timeframe with Stacy Robinson ("Robinson"). Robinson has (and remains) a Director of Benefits for Defendant.

26. Between February 2024 – May of 2024, Plaintiff was also discussing her health problems, accommodation requests, and medical needs with Fitzgerald. Plaintiff informed Fitzgerald of her health background, cancer history, and why she was seeking medical accommodations to work remotely. Fitzgerald would share with Plaintiff (in response) that he is being kept apprised of Plaintiff's health discussions and accommodation dialogue by human resources.

27. There were extensive discussions between January 2024 – May 2024 about Plaintiff's health and her requested accommodations. Initially, Defendant was only willing to accommodate Plaintiff by permitting her to come to the office 3 days per week instead of 2 days per week (with the balance allowing remote work). Then, after escalation by Plaintiff and an internal appeal process, Plaintiff was finally granted the ability to work from the office 2 days per week and 3 days per week remotely (via telecommuting).

28. Toward the end of her employment, Plaintiff was in fact going to work 2 days per week at Defendant's Robbinsville, New Jersey office location and working remotely 3 days per week. But Fitzgerald was very discriminatory towards Plaintiff during his several months of supervising her. By way of examples only, he:

6

- Seemed very annoyed with Plaintiff when she discussed her health or accommodation needs (in all aspects of his gestures and tone of voice).

- Told Plaintiff "I am trying not to jump to any conclusions about you in light of your health," but expressing Plaintiff didn't seem committed to her job (at which time Plaintiff politely and diplomatically opposed such claimed perceptions).

- Told Plaintiff iterations of comments such as her "heart doesn't seem to be in it" as to the job with no factual or work basis to make such assertions (other than likely perceptions of her health or requests for medical reasons to telecommute).

- Told Plaintiff iterations of comments at varying times that she is not present enough as a manager in his view (in reference to being in the office as much as he desired). This was absurd and discriminatory, as: (a) Plaintiff performed her job exceptionally regardless of physical location; and (b) Fitzgerald knew Plaintiff was either seeking or approved for medical accommodations (as of such comments).

- Told Plaintiff he was getting feedback from Plaintiff's team that they complained she wasn't present enough. Plaintiff asked her team, and they: (a) explained Plaintiff provided plenty of support; (b) was present enough; and (c) that they didn't lodge any complaints with Fitgerald.

29. Effective on or about May 17, 2024, Plaintiff was terminated by Defendant in a discussion with human resources management and Fitzgerald. Therein, Plaintiff was informed by Fitgerald she lacked enough of a presence, lacked availability, she didn't seem committed to the

7

job, and he believed she was looking for a new job anyway. None of this was true; and if anything, such perceptions serve as evidence of a discriminatory view of Plaintiff (and her perceived lack of commitment due to accommodation requests or needs).

30. As of May 2024, Plaintiff was still based out of Defendant's Robbinsville, NJ location and worked in that office location at least two days per week.

31. In approximately 7.5 years, Plaintiff was never issued any documented: (a) counseling; (b) discipline; or (c) any type of performance improvement plan.

32. Plaintiff was not only excellent at her job, but she also had experience and qualifications to work in a much more elevated role (as she had been in prior years transitioned to her final role due to a stated restructuring from working in a higher-level management capacity for Defendant). Hence, Defendant's need to manufacture totally subjective assertions to serve as a (pretextual) basis for Plaintiff's termination from employment.

33. Despite being terminated for alleged performance-based reason(s), Plaintiff was offered a substantial severance package in conjunction with her termination from employment if she agreed to legally waive all "discrimination" and "retaliation" claims against Defendant. Employees terminated for performance-related or cause-based reasons are not entitled to any severance within Defendant. This is well-established, admissible evidence of discrimination, pretext or retaliation.[2]

---

[2] See e.g. *See Staffieri v. Northwestern Human Servs.*, 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. 2013)(an employer who offered severance at the time of termination and in a sum of money when policies did not require upon condition of waiving claim supported finding of pretext among other facts); *Bartlett v. NIBCO Inc.*, 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011)(finding that a severance agreement offered contemporaneously to when the employee was terminated was "probative on the issue of whether NIBCO's motive for terminating *Bartlett* was [false]."); *EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267 (D. Nev. 2009)(denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy); *Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011)(severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by Fed.R.Evid. 408); *Brandy v. Maxim Healthcare Servs., Inc.*, 2012 WL 5268365, at *2 (N.D. Ind. 2012)(holding that severance agreements offered at the time of termination

34. There is simply no question Plaintiff was discriminatorily and retaliatorily terminated by Defendant (for pretextual reasons). With all compensation components and benefit valuation(s), Plaintiff lost compensation paying her in excess of $175,000.00 per annum, suffered significant emotional distress, and believes Defendant's malice in terminating her warrants punitive damages.

35. Following Plaintiff's termination from employment, Defendant sought (and advertised for) a Strategic Account Sales Manager to backfill Plaintiff's (unlawful) termination from employment.

### Count I
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
**(Discrimination & Retaliation)**

36. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

37. Plaintiff was terminated because: (a) of her actual or perceive disabilities; (b) her requested accommodations (intermittent days for appointments and remote working conditions; and (c) her opposition to Fitzgerald's discriminatory treatment of her.

38. Plaintiff was also not medically accommodated as: (a) she could have easily been permitted to work remotely more than 3 days per week; and (b) as a result of nonaccommodation, Defendant unnecessarily caused Plaintiff additional pain and discomfort related to her ongoing health problems. Plaintiff was denied reasonable accommodations she sought.

39. Defendant's actions as outlined in this lawsuit constitute both discrimination and

---

do not fall under Rule 408 because they are offered before a dispute arises, regardless if the employer "anticipated the severance agreement curtailing any potential future litigation."). retaliation claims when made contemporaneous to termination, as they are not governed by Fed.R.Evid. 408); *Brandy v. Maxim Healthcare Servs., Inc.*, 2012 WL 5268365, at *2 (N.D. Ind. 2012)(holding that severance agreements offered at the time of termination do not fall under Rule 408 because they are offered before a dispute arises, regardless if the employer "anticipated the severance agreement curtailing any potential future litigation.").

retaliation in violation of the NJ LAD.

## Count II
### Violations of the Americans with Disabilities Act, as Amended
**(Discrimination & Retaliation)**

40. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

41. Plaintiff exhausted her administrative remedies under the ADA by timely filing a Charge of Discrimination with the EEOC and being issued a right-to-sue letter.

42. The foregoing conduct also constitutes violations of the ADA, as amended.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to be prohibited from continuing to maintain its illegal policy, practice or custom of discriminating/retaliating against employees and is to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto;

B. Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date she first suffered discrimination or retaliation at the hands of Defendant until the date of verdict (and for all future losses);

C. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount determined by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate, including but not limited to, emotional distress and/or pain and suffering damages (where legally permitted);

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable law;

F. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to the Plaintiff in light of the caps on certain damages set forth in applicable law; and

G. Plaintiff's claims are to receive trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

*/s/ Jeremy M. Cerutti*
Jeremy M. Cerutti, Esq. (# 017192005)
Ari R. Karpf, Esq. (# 021842003)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
(215) 639-0801

Dated: August 13, 2024